**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-CR-60200-DIMITROULEAS/SNOW**

**UNITED STATES OF AMERICA**

**v.**

**JONATHAN MARKOVICH, and**
**DANIEL MARKOVICH,**

**Defendants.**

_____/

**GOVERNMENT'S DISCLOSURE OF EXPERT WITNESS AND EVIDENCE**

The United States of America hereby files this Expert Disclosure, pursuant to the Standing

Discovery Orders and Scheduling Order entered in this case [see D.E. 183-84], as well as Federal

Rules of Discovery 702, 703, and 705.

As the Government advised in its First and Second Responses to the Standing Discovery

Order [D.E. 46 at 6, D.E. 166 at 3], the United States intends to introduce the expert testimony of

Dr. Kelly J. Clark as part of its case in chief.[1] Dr. Clark has been retained as a substance abuse

treatment expert, and the Government plans to call her as an expert witness at trial.   Pursuant to

the Rules and Orders referenced above, and Rule 16(a)(1)(G) of the Federal Rules of Criminal

Procedure, the Government hereby provides a more detailed summary of Dr. Clark's proposed

expert testimony, including the opinions and bases thereof, that the Government intends to elicit.[2]

---

[1] Dr. Clark's resume was provided to Defendants on March 25, 2021, and can be provided to the Court if necessary.

[2] The following is a detailed summary the Government's expert's background and qualifications, the topics she is expected to testify about, and opinions that she is expected to render, which may include opinions on hypothetical situations. Dr. Clark may offer some or all of the following testimony and opinions as described in this Notice. This is not an exhaustive list of her testimony but a general outline, and the Government respectfully requests to add additional topics and observations during trial preparation.   The Government points out that Dr. Clark has done two

1

## The Expert And Her Background

Dr. Clark has been admitted as an expert witness in other addiction treatment fraud cases in this district; she provided expert testimony similar to the kind proposed here in two trials, and a Daubert hearing (United States v. Abovyan, et al., 18-CR-80122-MIDDLEBROOKS; United States v. Ahmed, et al., Case No. 19-CR-60200-COHN; and United States v. Snyder, et al., Case No. 18-CR-80124-ROSENBERG).[3]   In addition, Dr. Clark has been noticed as an expert in other pending addiction treatment fraud cases in this district. (United States v. Bailynson, et al., 18-CR-80124-RUIZ; United States v. Beetle, 19-CR-80234-MARRA; and United States v. Port, et al., 19-CR-20583-SINGHAL).

Dr. Clark is a licensed Medical Doctor (M.D.) in Florida (and in ten other states), and has a Master's in Business Administration (M.B.A.).   She has over 22 years of experience in addiction treatment; is board-certified in addiction medicine and psychiatry; is a distinguished fellow of the American Psychiatric Association, and the American Society of Addiction Medicine; has been a Chief Medical Officer for two multi-state addiction treatment companies; and worked on various national guidelines establishing the standards of care for addiction treatment, and urinalysis testing.   Since April 2019, Dr. Clark has served as the Immediate Past President of the American Society of Addiction Medicine (and was a former President), and remains on its Board.

Dr. Clark's testimony, including her expert opinions, will be based on her: (1) professional expertise, including medical training, clinical experience, and board certifications; (2) knowledge

---

expert reports, which will be provided to Defendants today as well, and can be provided to the Court if necessary. These expert reports provide even more detail on Dr. Clark's expected testimony and opinions.   Finally, many of Dr. Clark's conclusions, as well as her background and expertise, were detailed for the Defendants in the criminal Complaint filed in September 2020.   [D.E. 1.].

[3]  The transcripts of Dr. Clark's testimony were provided to Defendants (with patients' names redacted) earlier this evening.

of relevant medical standards of practice and care in addiction treatment; (3) review and publication of medical texts, journals, and treatises; (4) employment history; (5) continuing medical education requirements; and (6) her review of patients' files, billing data, prescription drug monitoring data ("PDMP"), and the Policy and Procedures Manuals pertaining to the treatment centers at issue in this case.

<u>**General Overview Of Dr. Clark's Expected Expert Testimony**</u>

Dr. Clark will testify about a variety of subjects relating to substance abuse treatment, including various levels of care including detoxification, partial hospitalization programs ("PHP"), intensive outpatient programs ("IOP"), and outpatient programs ("OP"); urine drug testing (<u>i.e.</u>, urinalysis, or "UA"), and other bodily fluid testing; and the use of prescribed drugs including controlled substances in treating addiction. Dr. Clark will also testify about her review in this case of billing data and patients' medical files relating to Second Chance Detox, LLC d/b/a Compass Detox ("Compass Detox"), and WAR Network, LLC ("WAR").

Broadly, Dr. Clark will outline for the jury how substance abuse treatment is supposed to work, the different levels of addiction treatment and circumstances under which each level of care is medically appropriate, and will explain all of the terms in the "Background" section of the Indictment. Dr. Clark will describe for the jury her expert opinions regarding: the types of patients who are appropriate for substance abuse treatment; the different kinds of substance abuse treatment; and the applicable standards of care for professionals in the field. Further, Dr. Clark will explain the different components of patient treatment using: treatment plans; therapy sessions; varying levels of care; how various staff members integrate in forming a cohesive treatment program for a particular patient; what kinds of professionals are qualified to render substance abuse

treatment; the importance of medical records in documenting and outlining treatment for a particular patient; how urinalysis testing (UA) is properly used in substance abuse treatment; what constitutes legitimate UA testing; how various medications and drugs are used in substance abuse treatment; and what constitutes legitimate use of drugs in treating addicts.   Finally, Dr. Clark will discuss the applicable standards of care in the addiction treatment field, both generally, and in the State of Florida.

Regarding UAs, Dr. Clark will comment on the different kinds of UA testing, namely initial point-of-care (POC) and other presumptive testing, and the more expensive definitive (and/or confirmatory) UA testing.   Dr. Clark will outline the purpose of each of these types of UA testing; how such UA tests should be reviewed; and when UA tests are medically necessary. Dr. Clark will further discuss the different kinds of controlled substances (such as buprenorphine products) used in addiction treatment, and the requirements and standard of care for providing such drugs to substance abuse patients.

After providing this overview of what constitutes proper substance abuse treatment, Dr. Clark will then describe what Compass and WAR, and by extension the Defendants, actually billed for and provided, and how they fell far short of these standards.

Dr. Clark will also testify about her review of the specific billing data and patients' medical files in this case.   Dr. Clark has already reviewed patients' files at Compass Detox and WAR, and will continue to do so in preparing for her expert testimony.   She will be prepared to comment on these patients' files, and on the improprieties she has identified in them. Dr. Clark will also talk about other trends in the billing data for Compass Detox and WAR, and other possible indicia of services billed by these entities that were not medically necessary, appropriate, and/or outside the

standard of care. Dr. Clark (as well as other witnesses) may provide summary charts to summarize aspects of the claims data and patient files. Dr. Clark may, like any expert, provide her opinions of hypothetical situations in the addiction treatment context in order to further explain what is, and what is not, medically appropriate in the context of addiction treatment.

As detailed in her expert reports, Dr. Clark will testify about the following subjects in a general overview of the addiction treatment field:

### A. Substance Abuse Treatment Generally

- Substance abuse treatment facilities and programs (such as Compass Detox and WAR) provide services, such as individual or group therapy sessions, to assist clients in managing their addictive disease and improving their functioning in life.

### 1. Levels Of Care And Therapeutic Services

- These treatment facilities typically bill for detoxification, residential treatment, partial hospitalization (PHP) or day-night treatment with community housing, intensive outpatient ("IOP"), outpatient ("OP"), UAs, and drugs used in treatment, which are all utilized in the care of drug and alcohol addicted people. The varying levels of treatment (collectively, "Treatment Programs") provided are based on the severity of the addiction or symptoms.

- UAs and drugs to treat addiction can be billed to insurance companies when they were ordered and evaluated and/or dispensed by licensed medical professionals, and when they were ordered for a legitimate medical purpose.

- Detoxification, residential treatment, and PHP, IOP, and OP therapy sessions can be billed if performed by appropriately credentialed persons, and if they served a legitimate medical purpose.

- The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"), has promulgated guidelines for substance abuse treatment. In addition, The American Society of Addiction Medicine ("ASAM") provides criteria for these different levels of substance abuse treatment care as well. These criteria/guidelines refer to varying levels of treatment provided based on the severity of the addiction. Inpatient Detox is for patients who are still using drugs and/or alcohol, and who need 24-hour care for medical withdrawal management. Other patients may require 24-hour care with less medical nursing support, called inpatient rehab or residential treatment.

- Patients also receive treatment for their addiction in the form of outpatient care, through either PHPs, IOPs, and/or OPs. PHP, IOP, and OP patients attend Treatment Programs on an ongoing basis where clinical and possibly medical treatment is rendered. The distinction between the three relates to the amount of therapy received on a daily or weekly basis (for example, PHP is 20 hours per week, IOP is 9 hours), and patients generally transition from various levels depending on their condition. For example, a patient could go from detox to PHP, then to IOP, and finally to OP as they stabilize, or they could just simply go into a PHP or IOP program to start with, or just be an outpatient (OP).   There is no requirement that patients start at detoxification or inpatient care before transitioning to a form of outpatient care and not every person suffering from an alcohol or drug addiction will require inpatient care at all.

- Patients attending outpatient care typically live in what is commonly referred to as a "Sober Home," with other patients who are likewise committed to an alcohol- and drug-free lifestyle.

- Notes from individual therapy sessions (and results from UAs, as described below) must be meaningfully reviewed by an appropriate medical professional and integrated into a treatment plan for a patient that is individualized to their needs. The treatment team should include medical professionals and the other clinicians (such as  counselors).  Further, billable therapy sessions should have some kind of therapeutic benefit, and cannot consist primarily of leisure activities (such as watching movies, for example).

- Patients should not be given access to alcohol or illegal drugs while in substance abuse treatment.   Continued use of these substances inhibits a patient's ability to manage their addiction or meaningfully participate in their own recovery, and the presence of these substances at addiction treatment facilities and treatment programs can influence other patients to relapse.

- Paying patients any form of inducement in order to attend treatment is not medically appropriate.   This practice incentivizes and rewards the patient's continued use of addictive substances.   Instead, treatment should be tailored to a patient's individualized medical needs.

- Encouraging or requiring patients to use illegal drugs, prescription drugs, or alcohol before they enroll in treatment, in the hopes that the patient appears qualified for a higher level of care because of how intoxicated they are upon admission, is never medically appropriate.   This practice jeopardizes patient health and safety and inhibits a patient's ability to recover.   In addition, this practice rewards and incentivizes the use of addictive substances.

## 2. Urinalysis Testing (UAs)

- UA testing is used by Treatment Programs and Sober Homes for diagnostic and therapeutic purposes, such as to determine if the patient: is using substances they should not be using; is not taking what they should be taking (medicine); or is falsifying their specimen in some way, potentially to hide continued drug or alcohol use.

- The results of these tests should be used to inform a patient's treatment plan.  For example, patients who test positive for drugs in a UA test may need to be stepped-up to additional levels of care for treatment or otherwise monitored.   The results of UA tests should be discussed with patients as part of their ongoing treatment plans and such discussions, and any resulting changes to the patient's treatment plans, should be documented in the patient's chart.

- UA tests can be billed to insurance companies, as long as they are for a legitimate medical purpose documented by the ordering medical professional. UA tests must reviewed, and acted upon, in a timely manner in order for there to be medical justification.  A UA test that shows that a patient is continuing to use drugs or alcohol has no legitimate medical purpose if the results are not timely reviewed by an appropriate medical professional, discussed with the patient, and incorporated into the patient's treatment plan.

- There should be a cost-benefit analysis to determine the type and frequency of UA testing. Frequency is usually higher at the start of treatment, and when a patient is doing poorly in treatment (i.e., may have relapsed, or are diverting their medicine).

- UAs must be: ordered by a licensed medical professional before they are done; specific as to what kinds of testing is being done; and must be done for some medical purpose.

- UA testing complexity ranges from screening tests, also known as Point of Care (POC) testing, which are not that expensive nor complex and provide instant results, to Definitive (or Confirmatory) Testing which are often sent to a lab for more complex analysis, and which are expensive.  More expensive definitive testing should not be conducted routinely and should not be conducted frequently on large panels of substances.  Instead, definitive testing should be used in targeted situations, such as when the initial POC tests results need greater clarity, when a prior urine sample is possibly contaminated, adulterated, or tampered with, or when it is important to differentiate between different substances and/or medications.

- UA tests should be reviewed by a medical professional when they are done or soon thereafter, particularly if the goal of the tests is to see if patients are remaining sober and not using drugs.

- UA tests should not be done by rote with a one-size-fits-all formula for every patient. Some patients require more frequent testing than other patients.

- A medical professional should evaluate a UA test for a particular patient before a subsequent UA test is done for that same patient, to determine medical necessity.

- Frequent UA testing in the same week for the same patient is rare and, while justifiable in certain circumstances, should not be a widespread practice.

- The drugs a UA test searches for should be tailored to a particular patient. For example, an opioid addicted person would not need to be tested for a large amount of other drugs if their problem is clearly opioid addiction. Similarly, a patient who self-confesses to recent heroin use or opioid use should not be tested for numerous different drugs not known or expected to have been abused by that patient.

### 3. The Use Of Medications In Substance Abuse Treatment

- Medications used to treat addiction include buprenorphine, methadone, and naltrexone. Because it can be misused, buprenorphine is classified as a controlled substance that requires the provider to register with the Drug Enforcement Administration (DEA), and obtain a "data waiver" and be subject to other regulations.

- Buprenorphine (Suboxone, Subutex, Bunavail, and Zubsolv) is used solely to treat opioid addiction, and may be properly used (often over a period of days) to help decrease patients' withdrawal symptoms from opioids. As a controlled substance, buprenorphine can be abused, particularly by individuals suffering from substance abuse, and it has a high potential for diversion.

- Buprenorphine daily doses come in two basic forms, buprenorphine alone (often called a "mono product"), and a more abuse deterrent form of buprenorphine combined with the medication naloxone ("combo product"). Clinical guidelines recommend the use of the combo product (Suboxone, Bunavail, Zubsolv) rather than the mono product (Subutex) because of its decreased misuse potential.

8

- The use of other drugs in substance abuse treatment, while sometimes appropriate, should be carefully monitored.  Some drugs, such as the anti-seizure medication Gabapentin, can be used when necessary to assist in managing the symptoms of withdrawal, but are also known drugs of abuse.  Likewise, benzodiazepines are highly addictive and should not be prescribed as a standard or one-size-fits all aspect of treatment, though patients who are addicted may need to be tapered off such substances as part of managing withdrawal symptoms.  Furthermore, the combination and quantities of medications, particularly medications with sedative qualities, should be closely monitored.  Patients undergoing addiction treatment should not be medicated to the point of sedation or to the point where they manifest physical symptoms of medication toxicity.   .

- When prescription or over-the-counter medications are misused in an addiction treatment setting, patients can become over-medicated and simply turn to these medications as a substitute for drugs or alcohol.   Patients who are severely over-medicated not only face physical and health risks, but also cannot meaningfully participate in their own recovery.

- Medication used must be strictly tailored to the medical needs of each individual patient.  A one-size-fits-all approach that allows for a large volume of patients being regularly provided the same amounts and kinds of drugs, without regard to their individual needs or medical justifications for such prescriptions, is not medically appropriate.

### 4. Patient Files, And Policy And Procedure Manuals

- Addiction treatment generally, admissions and discharges, and the ordering/use of therapy, UAs, and medications specifically, must be carefully documented in a patients' file to ensure continuity of care for their ongoing treatment, allow subsequent treating professionals to have enough information to continue treating a patient, and to allow for proper auditing and billing.

- Addiction treatment facilities are often are required to be licensed and/or certified by the state they operate in, and to provide Policy and Procedures Manuals as a condition of licensure outlining their compliance with that state's standards of care in the addiction treatment field, and for the levels of care their facility purports to provide.

- A treatment facilities' owners and operators are responsible to ensure that they are hiring and utilizing the appropriate individuals and professionals to provide care to addicted patients, that services are appropriately billed, and that safe, medically necessary services are provided.

## More Specific Areas Of Dr. Clark's Expected Expert Testimony

After providing an overview of substance abuse treatment, Dr. Clark will testify about Compass Detox and WAR specifically.  Based on her review of files and billing data from Compass Detox and WAR (and associated providers such as laboratories and a chiropractor), combined with her own experience and knowledge of industry standards, Dr. Clark will testify about the following improper practices at both facilities.

Dr. Clark will explain to the jury how Compass Detox and WAR ordered (and thereby caused to be billed) excessive and medically unnecessary UA testing, blood tests, therapy sessions, medications, and other medical procedures, some of which were never provided or given by unqualified personnel.  Dr. Clark will opine that Compass Detox and WAR used such unjustified or medically unnecessary procedures as a means of revenue generation, and not for addiction treatment focused on patient care.

Moreover, Dr. Clark will explain how her review allowed her to conclude that Compass Detox and WAR improperly prescribed large numbers of controlled substances, sedating medications, and other drugs to patients, including a so-called "Comfort Drink," that provided no therapeutic benefit but caused patients to remain at Compass Detox and WAR so they could be excessively billed, and to keep them docile and compliant.  Dr. Clark will describe how she has never seen nor heard of patients being given such a volume of drugs to treat their addiction in her entire career, and her view that what these facilities did in providing such drugs was aberrational and even shocking.  In addition, patients frequently tested positive for illegal drugs but their treatment did not change, and patients UAs were often shown to not actually be human urine (i.e., the samples were tampered with or contaminated), but again, nothing was done or documented in

the patient files. Thus, the UAs were not being reviewed and incorporated in a patient's treatment, as would be the case if the UAs were conducted for a medically necessary purpose. Dr. Clark will detail how Compass and WAR billed for services they did not provide, did not provide as billed, and which were provided by unqualified personnel. Further, Compass Detox and WAR provided false information to insurance companies about patients' status in order to justify additional payments. In addition, Dr. Clark will discuss the routine recycling of patients from Compass Detox to WAR, and back to Compass Detox. Finally, Dr. Clark will discuss the applicable standards of care in the addiction treatment field, both generally and in the State of Florida. Dr. Clark will describe her view on how Compass Detox and WAR fell short of such standards even as outlined in each facilities' very own Policy and Procedures Manuals, which Compass Detox and WAR were required to (and did) provide to the State of Florida for licensure.

**Specific Areas Of Testimony Regarding Compass Detox And WAR:**

Based on her review of patient files and billing data at Compass Detox and WAR, Dr. Clark may offer some or all of the following opinions.

- Compass Detox and WAR were designed to generate revenue by admitting substance abuse patients, often under the age of twenty-six on their parents' insurance, who were otherwise homeless and unemployed. The goal was to admit them over and over again and recycle them between Compass Detox and WAR, and not to treat their addiction. The program was designed to provide patients with food, housing, medications, and other things they valued in order to keep the patients at each facility, and then to bill them for therapy sessions, UAs, blood tests, and other excessive and/or medically unnecessary services that were often not provided and/or were provided by unqualified personnel. The billings were often done under out of network rates for extremely high amounts.

- Compass Detox and WAR used UA testing as a profit center. Based on a review of the data and selected patient's files, all that mattered was that the UA tests were done so that they could be billed. The UA results were not meaningfully reviewed by a medical professional, and served no legitimate medical purpose, as they were not integrated into

11

treatment.   The billing data and patient files demonstrate a clear lack of medical necessity based on the frequency and type of UA tests done.   The UA tests were not medically justified, correctly ordered, correctly reviewed, or used clinically in treatment.   The UA tests looked for far too many drugs in each individual test, and were done at too high a level of frequency per patient, with no attention to any medical reason for the testing.   The UA tests were excessive and extremely expensive, often thousands of dollars for testing for a single sample.   UA test results were frequently not reviewed by a medical professional. Positive tests for illegal drugs were often ignored and not acted upon, and the fact that patients' UA samples were not even human urine, suggesting they were contaminated and/or tampered with, was likewise never acted upon.

- Compass Detox patients were admitted to the highest level of care, detoxification, without sufficient medical justification, in a repeated, ongoing, and systematic way.   The admissions for detoxification were not sufficiently documented, and were often approved by unqualified personnel. Once admitted, the patients were not properly monitored or seen by a physician after their admission to a detoxification program, which is the highest standard of care, and the most expensive.   Compass Detox appeared to be admitting patients to detox only because it paid the most. Compass Detox patients were often admitted to detoxification after a single relapse (i.e., taking illegal drugs), which is not in and of itself a reason for admission to a detox program since the patient was not experiencing acute and medically dangerous withdrawal symptoms.

- Compass Detox and WAR patients were prescribed a high volume of sedating medications (particularly Compass Detox patients after their initial admission), and a "Comfort Drink" that mimicked intoxication.   The pattern of over-medication in the patients' files was unprecedented, and even dangerous for substance abuse patients.   Further, patients were consistently given the most abusable form of buprenorphine, the mono product (Subutex), rather than the more common and more clinically appropriate combo product (Suboxone), which was less likely to be abused.   Dr. Clark has never seen substance abuse patients so heavily drugged in her career. This pattern of excessive prescribing of medications to patients at Compass Detox grossly diverged from legitimate medical practice.

- Compass Detox patients often complained of being too tired or sedated, restless, having nausea, and other symptoms consistent with side-effects from the excessive medications they were given, which were deemed to be from withdrawal from illegal drugs in their medical files.

- Compass Detox patients were prescribed an exorbitant amount of "PRN" or "as needed" drugs which patients could get on request, and which were dispensed without limitation by unqualified staff who were not medically capable of determining if these drugs should be provided, without limitation, meaningful oversight, nor regard to dangerous interactions

between drugs (such as between buprenorphine and benzodiazepines).   The sheer number of "as needed" medications made available at Compass Detox and WAR, the inappropriate latitude given to staff to dispense such drugs, and the menu of options for different drugs despite any protocols or medical justification, was simply unprecedented in Dr. Clark's experience in substance abuse treatment.

- Compass Detox's practice was to make available a "Comfort Dink" on request that consisted of an alcohol-like shot of "medicine" consisting of water and two to five sedating substances such as Flexaryl or Bentyl.   Patients could have this "Comfort Drink" twice a day or more, for complaints such as "anxiety," withdrawal," or "insomnia."   The "Comfort Drink" mimicked a high, and was inappropriate, and even dangerous, to give to substance abuse patients.   Dr. Clark has never heard of a "Comfort Drink" or any similar type of treatment being given at an addiction treatment facility.

- Patients were cycled between Compass Detox and WAR in a clear pattern of revolving-door admissions.   Once patients were no longer being billed by Compass Detox and WAR, they were discharged with no provision made for their housing, and often returned to Compass Detox and WAR after living on the streets and using drugs again, going to another treatment center, or both.     Living at Compass Detox and WAR related housing often became patients' default living arrangement.   Indeed, Compass Detox and WAR patients were over-utilized to the point of being billed exorbitant amounts, including one patient who was billed for close to a million dollars in a 15-month period.

- Compass Detox and WAR patients were routinely absent from group therapy sessions, whether they were in an inpatient, PHP, IOP, or OP program.   Compass Detox and WAR patients were often so heavily sedated by the drugs they were given that they could not participate in group therapy sessions even if they did attend.   A clear pattern of patients not attending a sufficient amount of group sessions per week is shown in the patient files, and such patients' insurance plans were billed as if they had attended all required sessions.

- Compass Detox and WAR patients were routinely referred to chiropractic treatment with no medical justification and, in fact, the purported medical justifications provided often directly contradicted other information in the patient's treatment file.   These referrals appeared, in Dr. Clark's experience, to be offered as an additional perk, rather than to address a legitimate medical issue.

- Compass Detox and WAR patients routinely signed a Power of Attorney allowing the designee to deposit and withdraw funds from their bank accounts, among other things.   Dr. Clark has never seen such a pattern of POAs upon admission at an addiction treatment facility, particularly one dealing with vulnerable homes and unemployed patients.

13

- Compass Detox and WAR did not meet even the most minimal standards of care for substance abuse treatment as outlined in the Policy and Procedure Manuals they provided to the State of Florida for licensure.

- Dr. Clark will also describe how these patterns are evidenced in the eight beneficiaries identified in the substantive health care fraud counts in the Indictment (Counts 2-9), and other patients.

### Expert Reports

Crucially, and as a further outline of her testimony, Dr. Clark has written both pre-indictment, and post-indictment, expert reports summarizing her findings regarding Compass Detox and WAR based on her review and expertise as described above.   These expert reports have been produced to defense counsel.   Thus, as a result of this Notice and her expert reports, Defendants have a fulsome description of her expected testimony in order to prepare their defense, cross-examination, and perhaps to hire their own expert.   While Dr. Clark will continue to analyze patient records relating to services provided at Compass Detox and WAR, the disclosures to date adequately notice her anticipated testimony.

### Dr. Clark's Expert Testimony Will Be Helpful to the Jury, And She Should Be Admitted As An Expert Without Any *Daubert* Hearing

The issues of what constitutes proper substance abuse treatment, particularly the importance of regular attendance at therapy sessions, common procedures and medical care given to such patients in addition to addiction treatment, and the proper types, frequency, use of, and medical justifications for UA testing are integral to the fraud alleged in the Indictment.   And what constitutes proper substance abuse treatment, and the proper methods for providing it, are not common knowledge.   Dr. Clark will provide the jury with an outline of how substance abuse treatment is supposed to work.   She will also provide indications of possible fraud in the documentation and billing she reviews.   With her testimony as a road-map, combined with the

Government's fact witnesses with first-hand knowledge of what actually went on at Compass Detox and WAR, the jury will have the proper context to determine whether the patients at these facilities received appropriate substance abuse treatment, and whether the private insurers in this case were defrauded when they paid for claims billed by Compass Detox and WAR. Dr. Clark will thus provide (a) a baseline understanding from which the jury can judge for themselves whether the defendants committed health care and wire fraud as charged in the Indictment, and (b) specific examples of such fraud for the jury to evaluate as well.

While the Government has attempted to make this Expert Disclosure as complete as possible, the Government respectfully requests leave to further supplement this disclosure to address discrete issues that may present themselves in preparing for trial. The Government submits that any additional disclosures will assist the defense in being further prepared for trial, particularly in light of the tight timeline for trial preparation in this very complex and document-heavy case.

## Disclosure Of Other Lay Witness Testimony

In addition to Dr. Clark, the Government may call the following individuals as witnesses to discuss patterns and trends in patient treatment records, billing records, and financial records. The Government may also call witnesses from the private insurers that paid claims to Compass Detox and WAR. Finally, the Government may call a witness from the lender (Ocean Bank), and an individual from the Small Business Administration (SBA), regarding the Paycheck Protection program (PPP) loans that are the subject of Counts 34-35 (the bank fraud counts).

These witnesses will not be rendering expert opinions, nor medical opinions. Instead, they will testify about patterns and trends, and explain summary exhibits, regarding otherwise

voluminous information contained in the patient treatment records, billing data, and financial records.[4]   In other instances, they will be explaining the policies of the companies they work for regarding payment of claims or lending.   Thus, they are not expert witnesses, but lay witnesses. However, in an abundance of caution, and in the interests of full disclosure since the trial in this case may begin soon (which is what these Defendants have expressly chosen), the Government provides notice of the following witnesses, and the basic subjects of their testimony.   Such testimony constitutes lay witness testimony pursuant to Federal Rules of Evidence 601, 602, and 701, and does not constitute expert testimony under Rule 702. Nevertheless, the government hereby notifies defense counsel of such evidence in case portions of the testimony are objected to as or are later deemed to be within the scope of Federal Rule of Evidence 702.[5] These witnesses may offer some or all of the following testimony.

**Missy Parks, CFE, AHFI**:   Missy Parks is a Certified Fraud Examiner (CFE) and a member of the Association of Certified Fraud Examiners, as well as an Accredited Health Care Fraud Examiner.   She is currently a Principal at Myers and Stauffer LC, and has over two decades of experience in health-care related consulting, including consulting on health care fraud

---

[4] Unlike Dr. Clark, who will testify as an expert about whether patients' treatment or certain trends in treatment were medically appropriate, these witnesses will simply present and summarize the information reflected in in the patient files, billing records, or financial records they reviewed.   To the extent they offer any opinions, they will be lay witness opinions which are permissible under Rule 701.   For example, to date, the Government has produced over 1,948,317 pages of documents, including hundreds of thousands of pages of financial records.   In addition to these nearly 2 million pages of documents, the Government has produced four online patient file portals containing thousands of patient files for hundreds of distinct patients and numerous native spreadsheets reflecting thousands of lines of billing data.   The Government cannot possibly present and explain each patient file, each line of billing data, or each bank statement to the jury.   Instead, the Government intends to present the key trends and information from these records through the testimony of additional fact witnesses who are reviewing these files, as well as summary exhibits.   Thus, while the Government does not intend to accomplish this through expert testimony, out of an abundance of caution and to ensure that the Defendants have sufficient information to prepare their defense, the Government makes the following additional disclosures of anticipated witness testimony.

[5] This disclosure is not intended to exhaustively set forth these witnesses' testimony or the topics of their testimony.

investigations.   She has previously testified in health care fraud trials.   Ms. Parks, and others

working under her direction, have analyzed a sample of approximately 10-15% of patients' files

for Compass Detox and WAR, as well as related billing records.   The Government anticipates that

Ms. Parks, or another consultant to be designated by the Government, will testify concerning the

following trends, among others:

- Attendance rates for therapy sessions at Compass Detox and WAR; instances where patient files reflect that patients attended therapy, but the underlying therapy notes indicate that the patient was not paying attention and did not participate; instances where the patient files reflect that insurance was billed for a greater amount of therapy than a patient actually received on a given day or week.

- The use of the "Comfort Drink" at Compass Detox based on patient files.

- The recycling of patients to and between Compass Detox and WAR.

- The ordering, billing, and reviewing of UAs at Compass Detox and WAR, and associated laboratories.

- The ordering and billing of chiropractor services at Compass Detox and WAR, and associated providers.

- The ordering and administration of medications at Compass Detox and WAR, including controlled substances, prescription medications, and over-the-counter medications.

- The prescribing practices of Dr. Santeiro and Dr. Lieberman with respect to buprenorphine and other controlled substances.

In addition, Ms. Parks will also testify concerning the total amounts billed to and paid by

private insurers for addiction treatment services, UAs, and chiropractic services from Compass

Detox and WAR which are at issue in this case.   Ms. Parks may also create and testify about

various summary exhibits.   Finally, Ms. Parks will discuss the substantive health care fraud counts

(i.e., the underlying data, how these claims are identified), including confirming claims

information (i.e., the date of claim, revenue code, and the amounts billed and paid for each claim).

**<u>Elizabeth Martin, RN</u>**:   The Government expects that Elizabeth Martin, RN, who has testified in numerous health care fraud trials, or another witness designated by the Government, may testify to trends and information contained in patients' medical files (particularly therapy notes) for Compass Detox and WAR, such as patient attendance, descriptions of therapy sessions, and descriptions of patient participation.   Ms. Martin may highlight specific trends and examples, but will not opine on whether the treatment reflected in the files was medically appropriate.

**<u>Jennifer Mila, CPA</u>**:   The Government expects that Jennifer Mila, who is a CPA and employed as a forensic accountant by the FBI, or another witness designated by the Government, will testify concerning financial transactions involved in this case.   Ms. Mila's testimony will summarize the flow of money in this case, including from insurance companies to Compass Detox and WAR's accounts, and then to various personal and corporate accounts identified in the Indictment.   This testimony will also cover the specific transactions alleged in the Indictment as money laundering substantive counts (Counts 25-33), and associated records (such as financial and corporate records for the companies involved).

Ms. Mila will also testify: to the economic details of the transactions identified as overt acts in Count 10, and kickback counts in Counts 11-23 (including the underlying financial and flight records identifying the purchases); other examples of similar payments and flights; and the total amounts of payments to patients and recruiters in the form of money and flights.

Finally, Ms. Mila will testify to the contracts and economic details of the transactions identified in Counts 34-35 pertaining to the Paycheck Protection Program ("PPP") loans.

**<u>Private Insurance Witnesses</u>**: The Government will call one or more representatives of private insurance plans to testify concerning the coverage of substance abuse treatment, the process

for submitting and adjudicating claims, contracts, billing and reimbursement policies, and the circumstances under which claims for substance abuse treatment are and are not covered. These witnesses may also authenticate and discuss billing records, enrollment information pertaining to Compass Detox, WAR, and other providers at issue in this case, and policies and manuals applicable to the coverage of substance abuse treatment. In particular, the Government anticipates the testimony of these witnesses to cover some or all of the following general information about the coverage of substance abuse treatment:

- Private insurance plans provide insurance coverage to individuals or their children seeking behavioral health treatment, including substance abuse treatment. Children of covered members can also be covered under their parents' policy, including for substance abuse treatment.

- Private insurance plans have copays, deductibles, and other payments and fees associated with plans that cover substance abuse treatment and the patient or policyholder is responsible for those payments.

- Providers can be either in-network or out-of-network. In-network providers typically have a contract rate for various types of treatment that is reflected in a fee schedule. Out-of-network providers do not have a contracted rate and, as a result, they can obtain higher compensation than an in-network provider. Providers often undergo a credentialing process whereby the insurance company examines the provider's licensures and other aspects of their operations.

- Providers that submit claims to private insurance companies must provide information about the member's name, identification number, address, billing or revenue codes, diagnosis information, charges, and the provider's information. Claims submitted by providers are typically automatically adjudicated and processed by the insurance company.

- Private insurers rely on the truthfulness of the information contained on each claim when processing the claim, including that the services claimed were actually rendered, medically necessary, and rendered appropriately.

- There are various forms of substance abuse treatment, including detoxification, residential treatment, partial hospitalization, intensive outpatient, and outpatient. The insurance company representative(s) will explain the meaning of these different levels of care and

their minimum requirements (or their equivalents) as pertains to each insurer.   They will also explain the revenue codes associated with these levels of care.

- Many services are billed at a per diem rate, meaning that multiple therapy sessions or services, including (depending on the level of care) room and board, are bundled into a single claim.

- Claims are typically submitted by wire communications that cross state lines.

- The private insurance companies do not cover claims for substance abuse treatment where the patient received kickbacks to attend treatment at the particular provider, both because kickbacks are unlawful and because patients should go to a provider for medical services received not for improper incentives.   Examples of improper incentives include payments of money, airplane tickets, scholarships, massages, manicures, payments or waiver of copays, and other cash or non-cash inducements.   If the insurance companies knew about the payment of such incentives to a patient, they would not pay those claims.

- Private insurers reimburse for urine drug testing.   Point of care testing is often tested on site and is a relatively inexpensive test, typically done upon admission to determine what if any substance the member is positive for and then again when there are any suspicions that the member is using.   The testing is done to further the patient's treatment and the results should be used in the patient's treatment.   Confirmatory testing is more expensive and typically sent to a laboratory to identify how much of a substance is present. Typically, confirmatory testing is not medically necessary multiple times a week.

- Private insurers maintain reimbursement policies related to urine drug testing.   Providers are often required to notify insurers when patients undergoing addiction treatment fail urine drug tests.

- Insurance provider representatives may testify to any atypical billing patterns associated with Compass Detox, WAR, or related providers, including that many members came from out of state and that many members were readmitted to Compass Detox and WAR, sometimes multiple times.

- Private insurers may request information from providers regarding claims submitted, such as patient files and medical records related to the service purportedly performed, and private insurers typically require providers to maintain such records.

- Private insurers, or entities with which they contract, publish manuals and guidance outlining criteria for medical necessity for different levels of substance abuse care.

**PPP Witness**:   The Government will present a witness from the Small Business Administration (SBA), or another witness knowledgeable about the PPP program, to explain the purpose of PPP loans, the requirements for applying for and receiving a PPP loan, and the requirements for spending PPP loan money, as well as the terms of the contracts at issue in Counts 34-35.

**Department of Children and Families (DCF)**:   The Government may present witnesses from the state agency in Florida tasked with administering addiction treatment facilities, to explain the Policy and Procedures Manuals and licensures necessary to operate addiction treatment facilities such as Compass Detox and WAR, and these facilities' own Manuals and interactions with DCF or any other state agency.

WHEREFORE the Government notices its expert witness, provides information about its lay witnesses in the interests of full disclosure, and respectfully requests that Dr. Kelly J. Clark be admitted as an expert witness, without the need for any formal *Daubert* hearing.

Dated: June 11, 2021

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

DANIEL KAHN
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

By:     /s/ *James V. Hayes*
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
JAMIE DE BOER (FL Bar #A5502601)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 774-4276
James.Hayes@usdoj.gov
Jamie.DeBoer@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*James V. Hayes*

22