UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60020-DIMITROULEAS/SNOW

UNITED STATES OF AMERICA

v.

JONATHAN MARKOVICH, and
DANIEL MARKOVICH,

        **Defendants.**
_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE GOVERNMENT'S EXPERT WITNESS

The United States of America hereby opposes Defendants' Motion to Exclude the Proposed Expert Testimony of Dr. Kelly Clark ("Motion"). [D.E. 225]. Defendants' Motion to Exclude the Government's Expert should be denied. Dr. Clark's proposed expert testimony satisfies the criteria for admissibility, based on its relevance, factual basis, and reliability. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993).

Dr. Clark's expert testimony about the nature and purpose of addiction treatment generally, and the proper standard of care for providing it, will provide a baseline of knowledge on subjects beyond the average juror's understanding, allowing the jury to evaluate the fraud allegations in this case. Her expert testimony on the proper use of prescription drug treatment, therapy sessions, and urine testing in addiction treatment, and her opinions on whether such services billed for by the Defendants through Compass Detox and WAR[1] met this standard of care, will assist the jury

---

[1] While Compass Detox and WAR did not directly bill for urine testing, as alleged in the Indictment, Compass Detox and WAR patients' urine samples were referred to labs (including one controlled by a co-defendant) in exchange to for kickbacks paid to J. MARKOVICH as part of the charged health care fraud, wire fraud, and EKRA conspiracies. [See D.E. 1, Ct. 1, at ¶ 17]. These urinalyses tests were ordered by

in determining if health care fraud was committed.

Dr. Clark is eminently qualified as an expert and her testimony is squarely relevant, and because of this she has been admitted and testified as an expert witness in addiction treatment in the only two federal criminal cases dealing with substance abuse treatment that the Government is aware of to date, both of which were tried in this district, and was admitted as an expert after a lengthy Daubert hearing in a third case in this district that was resolved with all Defendants pleading guilty.[2]  Dr. Clark's proposed expert testimony in this case mirrors her testimony in these prior cases.   Defendants ignore this fact in their Motion, and provide little more than an outline of likely cross-examination topics.

There is no doubt that Dr. Clark is qualified to testify as an expert on substance abuse treatment and related billing.   She obtained her medical degree from the University of Wisconsin in 1979, and an MBA from Duke University, with a certificate in health sector management.   She is a licensed psychiatrist who is board certified in addiction medicine, and has more than 22 years' experience treating patients with addiction issues.   She is the past president of the American Society of Addiction Medicine.   She is a distinguished fellow of the American Psychiatric Association, and the American Society of Addiction Medicine.   Dr. Clark was a Chief Medical Officer for two multi-state addiction treatment companies (which necessarily billed for addiction treatment services and utilized testing laboratories), and thus is intimately familiar with billing for

---

Compass Detox and WAR staff, including two of the defendants in this case (Dr. Lieberman and Dr. Santeiro), with whom the Government alleges the Markoviches conspired.  Testimony from a medical expert regarding the medically appropriate—and inappropriate—uses of urinalysis testing in substance abuse treatment is thus squarely relevant to the core allegations in this case.

[2] United States v. Abovyan, et al., 18-CR-80122-MIDDLEBROOKS; United States v. Ahmed, et al., Case No. 19-CR-60200-COHN; and United States v. Snyder, et al., Case No. 18-CR-80124-ROSENBERG. The Government has provided transcripts for Dr. Clark in all three cases to Defendants.

addiction treatment generally, and how prescription drugs and urine testing should be used to treat addiction. Dr. Clark worked on various national guidelines establishing the standards of care for addiction treatment and testing. Accordingly, Dr. Clark amply satisfies the qualification prong of the Daubert test as it relates to her proposed testimony about medical necessity, standards of care, and billing practices.

Given Dr. Clark's qualifications, background, and experience, Defendants' cannot plausibly argue that Dr. Clark is not qualified to provide expert testimony on the basic kinds of addiction treatment. Instead, they appear to argue that an expert is not necessary at all, and that the Government can simply argue in closing about whether Defendants' committed fraud. But Dr. Clark as an expert will define terms and practices that are beyond the capacity of a layperson juror to understand. Further, Dr. Clark's expert testimony will provide the necessary context for the fact witnesses' testimony in this case. For example, fact witnesses will describe how patients at Compass Detox and WAR were overmedicated, and even provided with a "Comfort Drink"; Dr. Clark will explain how the over-medication of substance abuse patients with prescribed controlled substances and a "Comfort Drink" violates the standard of care. Defendants arguments that Dr. Clark did not review enough patients' files to make her testimony reliable are similarly unavailing, and are not a basis to preclude. Defendants' arguments that Dr. Clark should be excluded because she is not an expert in billing and urinalysis can be summarily rejected; indeed, her professional background and prior expert testimony in cases in this district shows that the exact opposite is true.

Dr. Clark's expert report and testimony will be based on her extensive professional experience with addiction treatment, and her knowledge, skill, experience, training, and education, applied to her analysis of the billing data and patient treatment records. This is more than a

3

sufficient indicator not only of her qualifications as an expert, but of her reliability. Her methodology is to apply her experience to the facts of this case. Dr. Clark will describe how addiction treatment is supposed to work, which the jury must understand to reach a verdict. Dr. Clark will opine on the medical necessity of the testing in this case based on her review of certain patients' files and the billing data, as described in her reports. Defendants protestations that she will draw legal conclusions is simply not true; Dr Clark will not comment on the ultimate issue for the trier of fact, but will give enough expert information to allow the jury to determine if fraud was committed. Dr. Clark qualifies as an expert under Daubert and its progeny. The Federal Rules of Evidence and other applicable authority militate strongly in favor of permitting her to testify. Dr. Clark's expert testimony and report should be admitted, and no Daubert hearing is necessary.

## LEGAL STANDARD

The admissibility of expert testimony principally depends upon its relevance, factual basis, and reliability. Fed. R. Evid. 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993). Expert testimony is relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue," *i.e.*, if it possesses "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401, 402. "A review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 (advisory committee notes).[3]

---

[3] Rule 702 requires the trial court to act as a "gatekeeper" to ensure that speculative and unreliable opinions do not reach the jury. Daubert, 509 U.S. at 589 n.7. The critical gatekeeping function "inherently requires the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (emphasis in original).

4

> This Circuit has recognized three requirements to admit expert testimony:
>
> First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a Daubert inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.

Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010). Moreover, even if the testimony satisfies these three requirements, it must then still satisfy Rule 403; it is therefore necessary for the district court to weigh the value of this type of evidence against the potential to mislead or confuse because expert testimony may be assigned "talismanic significance" in the eyes of lay jurors. Frazier, 387 F.3d at 1263. The burden of establishing each of these three requirements rests on the proponent of the expert opinion . . . ." Id. at 1260. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005).

The Eleventh Circuit has specifically recognized that prior experience constitutes a reliable basis for expert opinion. See Frazier, 387 F.3d at 1261. In such a situation, the proponent of the testimony must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion rendered, and how that experience is reliably applied to the facts. See id.; Fed. R. Evid. 702 (Committee Notes).

As to reliability, the same criteria that are used to access the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. Kumho Tire v. Carmichael, 526 U.S. 137, 152 (1999). In determining whether an expert's testimony is reliable, the Daubert factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on

5

experience or training.[4] These factors may also apply to assess the reliability of an expert's opinion that is based on experience and training rather than a rigorous scientific methodology. United States v. Barnes, 481 Fed. Appx 505, 513 (11th Cir. 2012) (citing Frazier, 387 F.3d at 1262).[5]

However, the inquiry is "flexible" and "'whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.'" United States v. Brown, 415 F.3d 1257, 1267, 1268 (11th Cir. 2008) (quoting Kumho Tire, 526 U.S. at 150-53 (1996)). Thus, not all Daubert factors (and sometimes none) will apply in every case. In some cases, "other factors will be equally important in evaluating the reliability of the proffered expert opinion." Frazier, 387 F.3d at 1262.[6] Finally, using these criteria, trial judges have "considerable leeway" in deciding whether nonscientific

---

[4] With respect to reliability, Daubert identifies five nonexclusive factors to help district courts assess the reliability of proffered expert testimony: (1) whether the expert's methodology can and has been tested; (2) whether the methodology is subject to peer review; (3) the potential rate of error; (4) the existence and maintenance of standards governing the methodology; and (5) general acceptance of the methodology. Daubert, 509 U.S. at 593-94.

[5] Thus, in all instances, the district court's gatekeeping function requires it to find "that an expert' testimony . . . rests on a reliable foundation." Daubert, 509 U.S. at 591. Experience, standing alone, is not a sufficient foundation rendering reliable any conceivable opinion the expert may express. Frazier, 387 F.3d at 1261. The Committee Note to the 2000 Amendments to Rule 702 states:

> [I]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

[6] Further, the particular factors that are useful for informing a trial court's gatekeeping decision will vary depending on the type of expert testimony at issue. Daubert, 509 U.S. at 593 ("Many factors will bear on the inquiry, and [there is no] definitive checklist or test."); Kumho Tire, 526 U.S. at 150-53 ("the law grants the trial judge broad latitude to determine . . . [whether] *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case."); Brown, 415 F.3d at 1266-68 (remarking that "the abuse of discretion standard thrives" in appellate review of Daubert issues given the considerable leeway entrusted to district courts.)

expert testimony passes muster. American Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009).

As other district courts have noted, despite its gatekeeping function, it is not the trial court's role to "make conclusions about the persuasiveness of the expert's opinions." Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel, Ltd., 2013 WL 836807, at *2 (S.D. Fla. March 16, 2003). Instead, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citing Daubert, 509 U.S. at 596); see also, e.g., Quiet Tech DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). Thus, attacks upon the assumptions underlying an expert's opinion or study typically "go[] to the weight of the evidence rather than its admissibility." Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011).[7]

Applying these standards shows that Dr. Clark should be permitted to testify as an expert, and further that no Daubert hearing is required.

## ARGUMENT

The Government expects that Dr. Clark's testimony will clearly aid the jury in understanding key factual issues in this case. Indeed, this is beyond any reasonable dispute. An average juror will not know what "detox" is, what levels of care can be used to treat addiction, how drug therapy can be used to treat addiction (particularly opioid addiction), the different

---

[7] See also, e.g., Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) ("A district court's gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury.") (quotation marks and citation omitted); Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995) ("Daubert reinforces the idea that there should be a presumption of admissibility of evidence . . . the Court expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.").

forms of urinalysis and how they are used in addiction treatment, and a host of other terms and subjects. Her expert testimony will thus aid the fact finder because it concerns matters that may go beyond the understanding of the average lay person.

Moreover, Dr. Clark's expert testimony are relevant to the factual issues that the jury must resolve. Dr. Clark will tell the jury how addiction treatment is supposed to work. She will then explain her opinion, based on her review of patient files and the billing data, that the services provided by Compass Detox and WAR were not medically necessary, and/or not provided, and how what was done deviated from the standard of care. The Government's fact witnesses will corroborate her, and Dr. Clark's testimony will comport with theirs. The Government will prove that Defendants knew or should have known about these improper practices. Without the Government's expert testimony, the jury will not be able to apply the proper standards to the facts to determine if Defendants committed the charged fraud, and will not know the full context of the Government's accusations. Since Dr. Clark's testimony is relevant, and will aid the jury in determining such key issues, her testimony should be admitted over Defendants' objections.

**I.      DR. CLARK HAS SUFFICIENT EXPERIENCE AND TRAINING TO TESTIFY AS AN EXPERT ON ADDICTION TREATMENT.**

Dr. Clark is a licensed M.D. (in Florida and in other states) with over twenty-two years' experience, and is board-certified in addiction medicine and psychiatry. She is a distinguished fellow of the American Society of Addiction Medicine, and has been a Chief Medical Officer for two multi-state addiction treatment facilities. She is the former President of the American Society of Addiction Medicine. She has testified as an expert in several trials. The fact that she is qualified to provide expert opinions on addiction treatment is beyond question.

A Chief Medical Officer of an addiction treatment facility, as Dr. Clark was, would

8

naturally know a great deal about conducting and thus billing for urine and blood tests in treating patients suffering from addiction. That is a necessary part of the job. She can talk about the frequency of urine testing, the importance of reviewing results, and why urine tests are used to not only see if patients are clean and sober while staying at a rehab facility, but also to ensure they are taking (and not diverting) their prescribed medications. She can also talk about the costs of such services and how certain tests are more expensive than others and thus subject to abuse; she knows this because she ordered such tests herself, and supervised others who did the same. As a Medical Director for an addiction treatment facility, Dr. Clark necessarily utilized urinalysis in the context of addiction treatment. Defendants' notion that she is not qualified to talk about urine testing given her background, and in particular since Dr. Clark already testified as an expert about urine testing in two recent addiction fraud trials (a fact that Defendants are fully aware of), is simply wrong.

Defendants arguments that Dr. Clark is somehow not qualified to provide expert testimony on billing and utilization for addiction treatment fare no better given her background and expertise. As shown in her resume, Dr. Clark analyzed billing claims for health plans to determine if patterns of fraud existed in the billing data. As Medical Director of health plans such as CVS Caremark, Dr. Clark has years of experience analyzing billing records for evidence of fraud, waste, and abuse as shown by the patterns of billing. Such work was done as part of her work as a Medical Director for the health plans as they assessed possible fraudulent practices, often in conjunction with these health plans' Special Investigations Units (SIUs). Thus, she has extensive prior experience on the subjects of billing and utilization that Defendants seek to preclude. Indeed, she is in fact an expert in utilization review and determining medical necessity, and knows precisely how private insurers evaluate claims for addiction treatment. And what Dr. Clark has to say on these subjects will

9

hardly be a line by line exposition of billing data. Anyone of her background could competently testify that, for example: (i) detoxification services are among the most expensive kinds of addiction treatment; (ii) definitive or confirmatory urine tests are far more expensive than point of care urine tests; and (iii) that PHP and IOP therapy services require a patient to be present for a certain number of session hours per day and per week or they cannot be properly billed.

Accordingly, Defendants can cross-examine the underlying assumptions and bases for Dr. Clark's expert opinions, but cannot deny that she has the experience to provide them.

## II.    DR. CLARK'S PROPOSED EXPERT TESTIMONY IS RELIABLE.

Dr. Clark used a reliable methodology in preparing her testimony in this case by reviewing certain patients' medical records and billing data as detailed in her expert reports which have been provided to Defendants. Dr. Clark also looked at trends in the overall billing data, as did other witnesses such as a consultant the Government will call as previously disclosed (Missy Parks). The specific patients she reviewed are examples of overall trends she identified. And as Dr. Clark will testify (just as she did in other previous trials), she also randomly reviewed patients' files besides those detailed in her expert reports to confirm that the same trends in the specific patients files she reviewed repeated themselves throughout the patient files and billing data at Compass Detox and WAR. Thus, she reviewed a far larger subset of Compass Detox and WAR patient files than Defendants argue.[8]

---

[8] And finally, Defendants' math requires clarification. Dr. Clark looked at more than ".001 percent" of patients in this case, despite Defendants contentions that she only looked at 10 patients (Motion at 9). Ten patients out of 984 total patients is roughly one percent, not 1/1000th of one percent (unless Defendants simply misplaced the decimal point in their Motion, and meant one percent). And Dr. Clark reviewed the patient files for twelve distinct patients. Defendants have these twelve patients' names, but the Government notes that Defendants were not aware Dr. Clark reviewed twelve patients' files in depth (and not ten) until earlier today, so it would be unfair of the Government to belabor this point. Thus, the Government includes this information to simply correct the record, and points out its view that Defendants are not at fault for

Moreover, most of the patients whose files she reviewed are the basis for the substantive health care fraud counts. Dr. Clark cannot possibly testify about all patients in a trial, nor review all patients' files in this case. Defendants seem to expect her to do exactly that.

In any case, any argument that Dr. Clark did not review a large enough sample of patient files, if that is relevant at all (and the Government contends that it is not), is, at best, a subject for cross-examination, and not a basis for exclusion. Dr Clark's prior experience and detailed file review, as set forth in two painstakingly specific expert reports which Defendants have had for some time, makes her testimony reliable.

### III. DR. CLARK'S EXPERT TESTIMONY IS RELEVANT, BECAUSE IT WILL ASSIST THE JURY.

Dr. Clark will testify about what the Defendants billed for through Compass Detox and WAR, which they owned and operated and certified that they would oversee. Such expert testimony is highly relevant and probative of Defendants' knowledge and intent, and thus it is admissible because it "logically advances a material part of the Government's case." Daubert v. Merrell Dow Pharms., 43 F.3d 1311, 1315 (D.C. Cir. 1995) (on remand from the Supreme Court). Finally, Dr. Clark's testimony, while highly probative, is not unduly prejudicial. It is a key part of the Government's proof. This is a health care fraud case, in which medical necessity is an issue. Defendants may cross-examine her, or present counter evidence, and the Court may instruct the jury as to the nature of expert testimony, but complete preclusion of Dr. Clark is unwarranted.

---

making such an argument. However, the Government also notes that the simple numbers of distinct patients are not the whole story; these twelve patients amounted to over 128 separate admissions (i.e, 128 files, since a new file is generated for each admission). Out of 2,285 patient files (the number of patients' files which Defendants provide in their Motion at 9-10), 128 is approximately 5.6% of the total amount of patient files, or one out of every seventeen admissions. The Government disclosed similar information in the Addendum to Dr. Clark's second expert report.

## IV. DR. CLARK WILL NOT MAKE LEGAL CONCLUSIONS.

Defendants repeatedly state that an expert witness may not offer legal conclusions. The Government agrees. Dr. Clark will not testify as to the ultimate legal questions in this case. Broadly, Dr. Clark will outline for the jury how addiction treatment is supposed to work, why it is ordered, what the payment criterion are, what the standard of care is, what it typically costs, and whether certain treatments she saw in patients' files were medically necessary and/or actually provided. These non-controversial areas of expert testimony are something many doctors could testify about, particularly one such as Dr. Clark who has worked extensively in clinical practice and billing utilization in the addiction treatment field. These subjects should not be in dispute. Defendants complain that Dr. Clark cannot testify about statutes referenced in the "Background" section of the Indictment. Dr. Clark will be talking about the medical and clinical terms in the Indictment. And while she will not dwell on any applicable statutes dealing with addiction treatment, anyone in this field could tell the jury that kickbacks are illegal under Florida law. Again, these areas are hardly contentious. Finally, billing therapy for a patient who was not there, when you know this was the case, is doing something that is "false", it is a "lie", it is "fraudulent." This is basic and fundamental, and thus Dr. Clark said so in her expert reports. But Dr. Clark will not opine before the jury that Defendants knowingly committed health care and wire, nor violated EKRA, as charged in the Indictment. She will simply provide the jury with the information that will allow them to decide such issues.

Here, Dr. Clark will testify as to her opinions on ultimate issues of fact. She will explain in what ways Compass Detox and WAR grossly deviated from the standards of care and practices in addiction treatment as she understands them. These are not legal conclusions. These are factual

issues about which the Government's expert will offer her opinion, which she is expressly allowed to do under the law. She will not tell the jury what result to reach, but will provide them with the necessary factual context to help them decide this case.[9]

### V. THIS COURT CAN DECIDE DEFENDANTS' MOTION WITHOUT A DAUBERT HEARING.

While Defendants move to preclude Dr. Clark, they also request a Daubert hearing in the alternative to determine the admissibility of her testimony and to ascertain "exactly what [her] opinions are." (Motion at 12.) This is simply not necessary; the Court and Defendants have more than enough information as to what Dr. Clark's opinions are. Her expert reports, and the Government's filed disclosure, are extraordinarily detailed. As such, any hearing for this purpose is a waste of time. And since Defendants have yet to provide anything at all about their expert in the face of the Government's voluminous expert disclosure, a Daubert hearing on the Government's expert to provide Defendants with even more information is simply unfair.

This Court has broad discretion over how to perform its gatekeeping function under Daubert. Holding an evidentiary hearing is not required; rather, Daubert specifies that the district court may satisfy its gatekeeper role when asked to rule on a motion *in limine*, on an objection during trial, or on a post-trial motion, so long as the court has sufficient evidence to perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

---

[9] Defendants omit to mention that an expert may testify as to her opinion on an ultimate issue of fact under the Rules. Fed. R. Evid. 704. An expert may not, however, merely tell the jury what result to reach Id. (Committee Notes). Telling the jury what result to reach is not helpful to the jury, and is therefore not admissible testimony.

Indeed, district courts regularly rule on Daubert motions without holding a hearing where, as here, the proponent of the expert has provided sufficient information to allow the court to ensure that an expert's testimony both rests on a reliable foundation and is relevant. See, e.g., Begualg Inv. Mgmt. 2013 WL 836807; United States v. Monroe, 2015 WL 7176417, at *9 (N.D. Ga. Nov. 12, 2015) (citing United States v. Scarpon, 2006 WL 5100541, at *1 (S.D. Fla. Sept.12, 2006) ("Daubert hearings . . . are typically held only when such a hearing would be fruitful for a case as well as a truly constructive use of the court's time and resources."). Because the Government has provided such information here, a Daubert hearing is unnecessary.

Finally, since anything Defendants complain about in Dr. Clark's proposed expert testimony could be cured through jury instructions, preclusion is far too drastic a remedy for any of the issues that they raise.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Preclude the Government's expert should be denied; and there is no need for a Daubert hearing.

Dated: July 20, 2021

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

By:  /s/ James V. Hayes
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
JAMIE DE BOER (FL Bar #A5502601)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 774-4276
James.Hayes@usdoj.gov
Jamie.DeBoer@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 20, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*James V. Hayes*