UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60020-DIMITROULEAS/SNOW

UNITED STATES OF AMERICA

v.

JONATHAN MARKOVICH, and
DANIEL MARKOVICH,

     **Defendants.**
_____/

**UNITED STATES' OPPOSITION TO DEFENDANTS' OMNIBUS MOTON IN LIMINE**

  The United States hereby opposes Defendants' Omnibus Motion in Limine [D.E. 239] ("Motion"). For the reasons set forth below, each motion *in limine* should be denied.

  I.  **THE GOVERNMENT'S WITNESSES CAN PROVIDE LAY OPINIONS, INCLUDING THE MEDICAL NECESITY OF SUBSTANCE ABUSE TREATMENT, AND DETOX AND RESIDENTIAL TREATMENT.**

  Defendants seek to preclude any lay witness opinion testimony about the medical necessity for services billed by Compass Detox or WAR, and specifically as to whether patients needed detoxification or residential treatment. But such testimony is expressly allowed under the Federal Rules of Evidence, and the case law applying it. As Defendants note, former employees of Compass Detox and WAR can testify about what they saw, heard, and perceived by working there. They are fact witnesses. But they can give opinions based on what they saw, based on both treating these patients at these facilities, and their past employment experience.[1] Many of them

---

[1] Lay witnesses can give opinions under Federal Rule of Evidence 701: If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702. Fed R. Evid. 701. "Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but

1

are nurses, behavioral health technicians, or therapists. Thus, they have professional licenses and training requirements. They are not being admitted as experts, and they are not doctors. However, they can still testify about what they saw at Compass Detox and WAR, and provide opinions based on their experience of what happened there; such testimony could necessarily include the specific areas Defendants complain about. These witnesses will not be diagnosing patients, just providing an opinion on what they saw as it relates to what was billed for in this case by Defendants through Compass Detox and WAR. Defendants' objections go to the weight of this testimony, not its admissibility. They can cross-examine nurses, therapists, and other lay witnesses, and confront them with the fact that they are not physicians or expert witnesses, but they cannot preclude such testimony altogether.

     A nurse, for example, telling the jury that patients at Compass and WAR were routinely provided a "Comfort Drink" and a plethora of controlled substances leading them to appear and act heavily sedated (and even hallucinate) is factual testimony. And this same witness (or a therapist) can then provide their opinion that giving drug and alcohol addicted patients a "Comfort Drink", in addition to a host of other sedating drugs, was inappropriate and counter-productive, and prevented such patients from meaningfully participating in billed therapy sessions, based on what they saw and their experience. A nurse or therapist experienced in treating patients with substance abuse problems can also testify that patients they saw appeared to be on drugs or drunk, and/or were consistently testing positive for drugs and/or alcohol while at Compass Detox and WAR, but were allowed to stay at these facilities anyway as long as they had insurance that paid

---

because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701, Advisory Committee Notes, 2000 Amendments.

highly. And such witnesses can provide their opinion that these patients who were routinely on drugs or drunk were not benefitting from the treatment they got at Compass Detox and WAR.

And as for medical necessity in the specific ways Defendants describe it in their Motion, a nurse, therapist, or other employee with experience in the field can surely testify that patients being given drugs by recruiters immediately prior to admission should not be put into a detox program since they are not going through acute withdrawal, and could also testify that a patient constantly relapsing and consistently being readmitted should have their treatment plan changed. A patient could state that they did not belong in detox and just took drugs to be re-admitted after being provided them by a patient recruiter, or that after they took the Comfort Drink they hallucinated or felt like they were high. A nurse or therapist can surely also provide their opinion that patients who routinely did not attend group sessions and continually requested more medications did not belong in treatment, and made the environment worse for patients who actually wanted treatment. A patient could say the same about themselves or other patients who they observed taking medications or in therapy sessions. Finally, applying the term "recycling" to a patient constantly re-admitted to Compass Detox and WAR is permissible lay witness opinion testimony; indeed, "recycled" is just a word. And the reality of patients being re-admitted over and over again is simply a fact. Indeed, it is a fact that both staff and patients can describe to the jury.

The law in this Circuit expressly provides that lay witnesses may provide such lay opinion testimony. Defendants ignore Eleventh Circuit precedent upholding this principle in a similar case to this one. In <u>United States v. Moran</u>, 778 F.3d 942 (11th Cir. 2015), therapists' and social workers' testimony about partial hospitalization program (PHP) patients they saw at a PHP clinic, and applying what they saw to the standard of care in the industry as these witnesses understood it when they opined that certain patients simply did not belong in a PHP program because they

3

were on drugs, not in acute psychological distress, or for other reasons, was upheld. That is precisely what lay witnesses will do in this case when they comment on what they saw, and talk about things they observed that made them think Compass Detox and WAR patients did not belong in treatment, and were constantly re-admitted while their addictions went unaddressed, and/or when patients simply did not participate in therapy because they did not want to, or because they were too heavily sedated. And "the opinions of lay witnesses may be introduced into evidence when those opinions are based on the firsthand knowledge or observation of the witness and are helpful in understanding his testimony or in the determination of an issue of fact." United States v. Smith, 550 F.2d 277, 281 (5th Cir. 1977).[2] Finally, lay witnesses are further permitted to offer opinions on an "ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704.

    Defendants' last argument is that the proposed lay opinion testimony is irrelevant and prejudicial. But such testimony is relevant, and is not unduly prejudicial. Under Federal Rule of Evidence 401, the basic test governing admissibility is that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. Rule 402 provides, in pertinent part, that "[a]ll relevant evidence is admissible." Here, the lay witnesses testimony will significantly aid the jury in determining whether a fraud was committed and the Defendants' intent, because these witnesses will establish that the wholesale provision of the "Comfort Drink" and controlled substances was known to anyone who spent any time at Compass Detox and WAR, including the Defendants, and further that the effects of these practices on patients were obvious, to laypersons and medical professionals alike. Further, chronic absenteeism is relevant, and

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit prior to October 1, 1981.

constant re-admissions and relapses, combined with patients entering detox who did not need it, are highly probative of fraud. These witnesses will provide direct evidence that Defendants were fully aware these things were going on at Compass Detox and WAR.

This lay witness opinion evidence is inculpatory and damaging to Defendants, to be sure, but that does not on its own make it overly prejudicial. Indeed, it provides the jury with contemporaneous observations of the patients whose insurance plans were billed by Defendants. The Government's expert will provide her opinion on the validity and medical necessity of the services billed by Defendants through Compass Detox and WAR, and Defendants will surely cross-examine her by stating "she was not there," and "did not see the patients at the time." This is true; but the Government's lay witnesses did, and they can tell the jury what they thought about what they saw.

**II. THE GOVERNMENT MAY PROPERLY PRESENT EVIDENCE RELEVANT TO THE HEALTH CARE AND WIRE FRAUD, KICKBACK, MONEY LAUNDERING, AND BANK FRAUD CHARGES.**

There is no escaping the fact that this case is about money. The Defendants, through their treatment centers and related providers, submitted and caused the submission of nearly $112 million in claims—many of which were false—to private insurers often requesting money to which Defendants were not entitled. Insurers paid approximately $28 million of those claims. Evidence about what happened to this money is thus direct evidence of the crimes charged and the Court should permit it to be presented to the jury.

Indeed, the Eleventh Circuit and courts in this district routinely admit such evidence when the "evidence of wealth or extravagant spending" is "relevant to issues in the case and where other evidence supports a finding of guilt." United States v. Bradley, 644 F.3d 1213, 1271-72 (11th Cir. 2011) (in Medicaid fraud case, evidence of Defendants' profit and spending "was probative

of the defendants' motive, even if only slightly so"); see also United States v. Hope, 608 F. App'x 831, 837 (11th Cir. 2015) (in health care fraud and money laundering case, "admission of evidence regarding Hope's wealth and luxury purchases was not erroneous because it was relevant to the issues in the case, and other evidence supports Hope's guilt"); United States v. Amor, 2015 WL 6438479, *2 (S.D. Fla. Nov. 23, 2015) (Lenard, J.) ("A district court has broad discretion to admit the Government's wealth evidence so long as it aided in proving or disproving a fact in dispute.") (quotation and citation omitted).

As with many evidentiary issues, whether evidence of the Defendants' spending is admissible "must turn on the facts of each specific case." Bradley, 644 F.3d at 1271. Here, as alleged in the Indictment, the money paid by insurers was used to enrich the Defendants, further the fraud, pay patient recruiters and purchase flights for patients, which constitute illegal kickbacks. Defendants even took patients out on a yacht owned by co-Defendant Richard Waserstein in lieu of therapy sessions, and billed these trips as if they were legitimate therapies. As alleged in Counts 24-33, J. Markovich and Waserstein also laundered these fraud proceeds through an intricate labyrinth of companies and bank accounts, including their personal accounts. The money was ultimately used to fund their lifestyle, including luxury purchases, as well as other business in which one or both of them are involved (such as real estate, in which some of the fraud proceeds were used to purchase properties). Some of the properties purchased with the fraud proceeds were used to house patients, during which time patients were provided money and drugs by recruiters just so they could relapse and start the fraudulent billing cycle again in the Defendants' expensive detox program.

The Defendants also used their lifestyle to help entice patient recruiters and keep them in the fold. For example, Defendants converted substance abuse patients into patient recruiters and,

6

in addition to paying them to recruit patients, also took them on luxury trips, bought them luxury items, and even offered as an incentive an opportunity to drive their luxury vehicles. The lure of the Defendants' lifestyle—funded with fraud proceeds—is one of several ways that the Defendants kept these recruiters on the line for so long. The patient recruiters will testify to this.

In addition, the Defendants' use of fraud proceeds to make luxury purchases is squarely relevant to Defendants' intent and motive. As in many fraud cases, the Government will argue that the Defendants committed fraud in order to make money so that they could fund their desired lifestyle. Evidence that Defendants' lifestyle comported with this motive is therefore relevant. See Hope, 608 F. App'x at 839 ("The evidence also goes to Hope's motive to commit the offenses."); Amor, 2015 WL 6438479, *3 (account funds and "personal assets such as an airplane, waterfront home, and yacht" was "necessary to complete the story of the crime," "inextricably intertwined with evidence regarding the offenses," and "highly relevant to Defendant's motive for committing the crime of stealing government money—i.e., to fund his lifestyle and pay for luxury expenses.").

### III.  THE GOVERNMENT SHOULD BE PERMITTED TO PRESENT EVIDENCE THAT DEFENDANTS KNEW THEIR CONDUCT WAS ILLEGAL OR CRIMINAL.

Defendants next argue that the Government may not characterize supposedly lawful practices as criminal. This argument makes no sense. Of course the Government is going to argue that the Defendants' conduct amounted to a crime. Sometimes the Defendants did this through outright criminal means—such as paying for illegal drugs provided to patients—and sometimes they operated their business in a way that resulted in fraud—such as through the overmedication of patients. Not every independent action was criminal, but many of those actions were conducted to facilitate a criminal purpose. That is the nature of a massive fraud conspiracy.

Defendants seem to be primarily concerned about what evidence the Government will present about the "Comfort Drink." Contrary to Defendants' assertion that "there is nothing illegal about the comfort drinks" (Motion at 5), the very creation of these drinks violated Florida law. The Comfort Drinks were compound medications (i.e., mixtures of multiple distinct medications) and Compass Detox did not have a compounding pharmacy license. This was discussed in the preliminary hearing in this case, has been disclosed in discovery and interview reports produced to the defense, and is one of many reasons why the Comfort Drink is an egregious part of this fraud. The Government will present evidence that the Markoviches knew that the Comfort Drink was illegal compounding, but nonetheless it continued to be provided to patients. That is direct evidence of Defendants' intent to violate the law, is squarely relevant to the charges at hand, and the Government should therefore be permitted to present it.

In fact, evidence of this illegal compounding is inextricably intertwined with the Government's proof of the Defendants' knowledge and intent. The Government expects that its witnesses will testify that Compass Detox staff was repeatedly informed that the creation of the Comfort Drink was "illegal." Documentary evidence will corroborate this. The fact that the practice persisted despite such warnings of its illegality is one of the reasons why Defendants knew they were in the wrong.

With respect to marketing, the entire dispute on the EKRA charges is whether the Defendants' knew their conduct was illegal. The Government's EKRA charges pertain to improper incentives (such as flights, money, and drugs, among other things) offered to patients and recruiters, as well as laboratory kickback arrangements. The Defendants may argue that these incentives were actually proper or that the Defendants did not know that this was happening or that this was illegal, but they may not preclude the Government from arguing that the very conduct

at the core of this case violated the law (both Florida state law and federal law).  In any event, evidence that the Defendants also engaged in legitimate marketing efforts such as advertising or other promotional activities is irrelevant to whether the transactions alleged in Count 10 and the substantive kickback counts were illegal kickbacks.  As explained in the Government's Omnibus Motion in Limine [D.E. 240], such evidence of other good acts should generally be excluded because it does not exculpate the Defendants of the instances charged or alleged by the Government to be criminal.

### IV.   THE SOCIAL MEDIA EVIDENCE THAT THE GOVERNMENT INTENDS TO OFFER IS RELEVANT AND NOT HEARSAY.

Defendants next argue that social media evidence should be excluded because it cannot be authenticated, it is unsubstantiated, and it is hearsay.   Defendants are incorrect.

While the Defendants do not identify precisely which exhibits, or examples thereof, their Motion is designed to exclude, all of the social media exhibits that the Government intends to offer can be authenticated, are relevant, and are not hearsay.   Indeed, as described below, many will be authenticated by participants in the social media posts and qualify as co-conspirator statements.

Pursuant to Federal Rule of Evidence 801(d)(2)(E), co-conspirator statements made "during and in furtherance of the conspiracy" are not hearsay.  See United States v. Harris, 886 F.3d 1120, 1130 (11th Cir. 2018).  To admit a statement as a co-conspirator statement, the Government must prove by a preponderance of the evidence:   (1) that there was a conspiracy; (2) that included the declarant and the defendant; and (3) the subject statements were made during the course of and in furtherance of the conspiracy. Id. The co-conspirator statement and independent evidence may both be considered in this determination, and co-conspirator statements may be provisionally admitted and subsequently connected to the conspiracy with other evidence.  Id.;

see also United States v. Amede, 977 F.3d 1086, 1097 (11th Cir. 2020).

Broadly speaking, the Government intends to offer the following categories of social media evidence in this case, all of which are readily authenticated by the Government's witnesses, are relevant, and are not hearsay.

- <u>Facebook chats between Government witnesses and patients or other recruiters</u>: The Government seized via search warrant Facebook accounts, including chats, of certain recruiters. Some of those individuals, such as Christopher Garnto, Mario Kustura, and Elan Bakhshi, will testify in the Government's case in chief. These individuals, who were charged alongside the Defendants in September 2020 and two of whom have pled guilty to conspiring with the Defendants, can authenticate their own Facebook records. All three of these witnesses engaged in chats with patients and with other recruiters wherein they attempted to recruit patients to Compass Detox and discussed how to recruit patients.

- <u>Facebook chats between Compass and patients</u>: Compass Detox also maintained its own Facebook page, through which it communicated with patients. The Government may seek to offer into evidence chats between the Compass Detox page and prospective patients, which can be authenticated by former Compass Detox employees.

- <u>Blog posts on Compass' website that can be authenticated by Government witnesses</u>: In addition, Compass Detox regularly posted blogs on its website about topics relating to addiction treatment. The Government may introduce some of these blogs as evidence from which the jury can infer that the Defendants understood the right way to operate a treatment center. Such records will be authenticated by a witness who has reviewed them and understands how Compass Detox's blog process worked. While these posts are "anonymous," they are on Compass Detox's webpage and can be authenticated by the Government's witnesses.

These statements are not hearsay, but rather direct evidence of the existence of a conspiracy and co-conspirator statements in furtherance thereof. See, e.g., United States v. Hill, 745 F. App'x 806, 813 (11th Cir. 2018) (in kickback scheme, group text messages used to communicate among marketers to encourage sales efforts and provide instructions were admissible as co-conspirator statements in furtherance of the conspiracy). For example, a patient recruiter actively marketing Compass Detox to patients and offering to pay a patient or buy them a flight is central to both the health care and kickback conspiracy charged in Counts 1 and 10. Likewise, one recruiter telling another recruiter the kickback rates for different types of insurance policies is

similarly a statement in furtherance of the conspiracy. At a high level, these are the types of chats that the Government will seek to offer into evidence and such conversations fit squarely within the definition of co-conspirator statements.

> **V. THE GOVERNMENT'S WITNESSES WILL TESTIFY THAT THEY KNEW WHAT DEFENDANTS WERE DOING WAS ILLEGAL AT THE TIME, AND COULD UNDER CERTAIN CIRCUMSTANCES PERMISSBLY TESTIFY THAT THEY REALIZE NOW DEFENDANTS' CONDUCT WAS ILLEGAL.**

For some reason, Defendants move *in limine* to exclude witnesses from testifying that they did not know their conduct nor Defendants' conduct was illegal at the time, but now realize it was. First of all, the Government will present evidence that many people at Compass Detox and WAR knew kickbacks were illegal at the time, and thus they took steps to conceal them. It is common sense that billing insurers for services that are never given is illegal. To the extent a witness testifies that he did not view certain conduct as strictly illegal at the time but was uncomfortable with it, and realizes now that it is illegal, this could come up on cross-examination when defense counsel asks a witness why they continued working at Compass Detox or WAR if they were uncomfortable with what was being done there, or even if they were not bothered at the time. Defendants' motion *in limine* is premature, and perhaps even unnecessary; the Court can rule on an objection if such testimony ever comes up at all.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that Defendants Omnibus Motion in Limine be denied in its entirety.

Dated: July 20, 2021

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

By: /s/ James V. Hayes
JAMES V. HAYES (FL Bar # A5501717)
Senior Litigation Counsel
JAMIE DE BOER (FL Bar #A5502601)
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 774-4276
James.Hayes@usdoj.gov
Jamie.DeBoer@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 20, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*James V. Hayes*